UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


VALERIE BELL,

      Plaintiff,                      Civil Action No. 15-11104

            v.                   District Judge Denise Page Hood
                                Magistrate Judge R. Steven Whalen

COMMISSIONER OF SOCIAL
SECURITY,

      Defendant.

_____/

## <u>REPORT AND RECOMMENDATION</u>

     Plaintiff Valerie Bell ("Plaintiff"), proceeding *pro se,* brings this action under 42 U.S.C. §405(g), challenging a final decision of Defendant Commissioner denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act. The parties have filed cross-motions for summary judgment which have been referred for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B). For the reasons discussed below, I recommend that Defendant's Motion for Summary Judgment [Docket #21] be GRANTED, and that Plaintiff's Motion for Summary Judgment [Docket #17] be DENIED.

## PROCEDURAL HISTORY

On January 25, 2012, Plaintiff applied for DIB and SSI, alleging disability as of August 30, 2005 (Tr. 190-193, 194-199). After the initial denial of her claim, Plaintiff requested an administrative hearing, held on October 1, 2013 in Mount Pleasant, Michigan (Tr. 44). Administrative Law Judge ("ALJ") Dawn M. Gruenburg presided. Plaintiff, then represented by Andrew Ferguson, testified (Tr. 50-77), as did Vocational Expert ("VE") Michelle A. Ross (Tr. 78-81). On November 13, 2013, ALJ Gruenburg found that Plaintiff was not disabled (Tr. 14-39). On January 22, 2015, the Appeals Council denied review (Tr. 1-5). Plaintiff filed the present action on March 25, 2015.[1]

## BACKGROUND FACTS

Plaintiff, born October 15, 1985 was 28 at the time of the administrative decision (Tr. 39, 190). She completed 12th grade and worked previously as a cocktail waitress/bartender, hostess, nail technician/cosmetologist, salesperson, and cashier (Tr. 214). She alleges disability as a result of fibromyalgia, cervical spine fusion surgery, anxiety, depression, and whiplash (Tr. 213).

### A.    Plaintiff's Testimony

*Plaintiff's counsel prefaced his client's testimony by stating that her neck problems*

---

[1] Plaintiff was represented by counsel at the time the Complaint was filed. On January 16, 2016, her attorney consented to an order for his withdrawal as counsel. *Docket #8.* Plaintiff, now proceeding *pro se,* filed a motion for summary judgment on June 9, 2017. *Docket #17.*

*resulting from an automobile accident prevented her from looking up, down, or holding her head level* (Tr. 49). *He stated that the neck condition, combined with depression, prevented Plaintiff from performing full-time work* (Tr. 49). *He amended the alleged onset date from August 30, 2005 to July 1, 2011, acknowledging that Plaintiff had worked until 2011* (Tr. 51).

Plaintiff then offered the following testimony:

She stood 5' 4" and weighed 297 pounds (Tr. 48-50). She had gained weight in recent years due to inactivity and "emotional issues" which resulted in spending "a lot of time . . . in bed and eating" (Tr. 50). She lived alone at her father's one-level vacation home in Bay City, Michigan (Tr. 51-52). She had a dog (Tr. 52). Her mother helped her do laundry and vacuum once a week and her father took care of the outside chores (Tr. 52).

She was unable to work due to the strain of holding up her head (Tr. 53). She experienced relief by lying down (Tr. 53). In addition, she experienced "burning pain" in the nerves at the base of her "brainstem," causing balance, vision, memory, and hearing problems (Tr. 53). She experienced depression resulting from the physical limitations (Tr. 53).

In response to questioning by her attorney, Plaintiff reported that the neck pain radiated into her shoulders (Tr. 55). On a 10-point scale, her pain ranged between a level "5" and "10" (Tr. 55). Her average level of pain was a "6" (Tr. 55). She was unable to move her neck up or sideways and moved from the waist if she needed to change her view (Tr. 56). Moving her neck downward was painful (Tr. 56). She was unable to bend over due to neck

strain and dizziness and vision problems (Tr. 57). She picked items from the floor by using her toes (Tr. 57). She was unable to reach overhead due to her inability to raise her shoulders (Tr. 58). She opined that she would be unable to work at a computer or even a job with a sit/stand option due to difficulty holding her head up (Tr. 58-59). She spent most of the day reclining and got up only to use the bathroom (Tr. 59). She was unable to walk for more than one block due to neck pain and was unable to lift more than one gallon of milk (Tr. 60-61). She could sit for up to half an hour provided that she was able to rest her head (Tr. 61-62). Pushing and pulling caused shoulder pain but she did not experience problems with manipulative activities such as opening a jar or buttoning a shirt (Tr. 62).

As a result of depression, Plaintiff experienced crying spells every day (Tr. 63). She attempted suicide on one occasion by ingesting pills but came to her senses and contacted a doctor (Tr. 63-64). She continued to have suicidal ideation but no plans (Tr. 64). She was depressed by her physical limitations and between 2005 and 2013 had gained over 150 pounds (Tr. 64). Her food preparation was limited to relatively simple meals (Tr. 65). She experienced difficulty mopping, vacuuming, doing laundry, and washing dishes (Tr. 66).

Plaintiff experienced good but limited results from pain and psychotropic medication (Tr. 66-67). She experienced the side effect of tiredness and also had memory problems due to the "brain stem flare up" (Tr. 67). Her activities were limited to watching television while lying in bed (Tr. 67-68). As a result of inactivity, she experienced blood clots in her leg (Tr. 68).

Between 2005 and 2009, Plaintiff worked at a salon as a makeup and hair stylist (Tr 69-70). After the 2005 accident, her work was limited to doing manicures (Tr. 70). The work did not involve seeing more than one client a week (Tr. 71). In 2010, she worked at her parents' pharmacy as a cashier (Tr. 71). The lifting was limited to 10 pounds and she did not work more than eight hours a week (Tr. 72). She called in sick frequently and was allowed to use a stool (Tr. 72). In 2011, she had two two-week stints as a cashier at a beauty supply store and manicurist respectively (Tr. 73). The work ended due to her difficulty "standing up, being away from home[,] and being around people" (Tr. 73).

Plaintiff used a "soft collar" which supported her neck but created restricted movement (Tr. 74). She received counseling on a weekly basis and saw a psychiatrist once a month (Tr. 75). Until recently, she treated with a family doctor for the physical problems but recently, had begun seeing a neurologist (Tr. 75). Her treatment for the physical problems included steroid injections, nerve blocks, and physical therapy (Tr. 75). She was hesitant to undergo additional surgery because the initial neck surgery made her condition worse (Tr. 77).

**B. Medical Evidence**

**1. Records Related to Plaintiff's Treatment[2]**

February, 2007 treating records by neurosurgeon S.T. Chakravarthi, M.D. state that Plaintiff had returned to "restricted work duties as a manicurist" following October, 2006 cervical spine fusion surgery (Tr. 430). A March, 2007 MRI of the cervical spine was unremarkable (Tr. 508, 536). March and April, 2007 treating records by Dr. Chakravarthi note that Plaintiff received Elavil, Percocet, Vicodin, and nerve blocks for depression and the neck condition (Tr. 421-422, 428). October, 2007 records by Paul LaClair, M.D. note Plaintiff's acknowledgment that her depression was "situational" (Tr. 530). He noted the absence of radiculopathy (Tr. 531). In November, 2007, Dr. Chakrvarthi noted that since 2006 cervical fusion surgery, Plaintiff had experienced "quite a bit" of improvement from "radiofrequency rhizotomy and injections" (Tr. 424, 435-438, 513). Treating records by Phoenix Family Physicians from the same month note an unremarkable neck appearance (Tr. 495). The same month, Dr. LaClair noted that facet rhizotomies had reduced the cervical spine pain (Tr. 528).

May and July, 2008 treating records by Dr. LaClair note Plaintiff's desire to reduce her use of Vicodin (Tr. 520, 523). He noted that she was making "slow progress" in physical therapy (Tr. 523). In September, 2008, Dr. LaClair noted that Plaintiff had experienced

_____

[2]Medical records created prior to the amended alleged onset date of July 11, 2011 are included for background purposes only.

"some withdrawal issues from her pain medications" and was currently on Suboxone (Tr. 518). In January, 2009, Dr. LaClair noted a reduced range of neck motion (Tr. 442, 515). He declined her request for narcotics due to her history of substance abuse (Tr. 442). The following month, Dr. LaClair referred Plaintiff for psychological services (Tr. 443, 513). March, 2009 imaging studies of the thoracic spine, chest, and lumbar spine were unremarkable (Tr. 502-504). A CT of the cervical spine was also unremarkable (Tr. 505). An April, 2009 CT of the abdomen and pelvis showed normal results (Tr. 500).

In August, 2010, Plaintiff was admitted for voluntary inpatient psychiatric treatment after expressing suicidal ideation resulting from her mother evicting her following the discovery that the mother was sexually involved with Plaintiff's boyfriend/fiance (Tr. 387, 393). Plaintiff reported further that her continued work at her father's pharmacy was in jeopardy because her father was in danger of losing his pharmaceutical license (Tr. 387). Douglas L. Foster, M.D. noted an "extensive" history of substance abuse (Tr. 388). Plaintiff was assigned a GAF of 25 at the time of admittance and a 45 at discharge four days later[3] (Tr. 391-392).

---

[3]

A GAF score of 21–30 indicates "behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment OR inability to function in almost all areas. *Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders* (4th ed.2000)("*DSM-IV-TR*"), 34. A GAF score of 41–50 indicates "[s]erious symptoms ... [or] serious impairment in social, occupational, or school functioning," such as inability to keep a job. *Id.*

In September, 2010, Plaintiff sought emergency treatment for neck pain (Tr. 296). She reported that she worked part-time as a cashier (Tr. 297). Plaintiff's request for narcotics was denied due to being placed on Suboxone "for detox" (Tr. 296). She was diagnosed with a probable "exacerbation of her chronic pain" (Tr. 368). She became verbally abusive when her request for narcotic pain medication was denied (Tr. 368, 372, 378). The emergency room physician opined that "it became very apparent . . . that the patient does not really have much pain in her neck as she was able to jump out of bed without any difficulty" (Tr. 368). He determined that Plaintiff had "drug seeking behavior" (Tr. 368). A CT of the cervical spine showed only unremarkable postoperative changes (Tr. 299). October, 2010 treating records state that Plaintiff requested a new family doctor to discuss pain medication/management (Tr. 348). An MRI of the cervical spine from the same month was unremarkable (Tr. 293). William R. Brooks, M.D. noted ongoing neck pain of "unclear" etiology (Tr. 347). He assessed Plaintiff with depression "associated with chronic pain," a history of panic disorders, and "significant weight gain" (Tr. 347). He noted a normal range of shoulder motion and only "mild" tenderness of the cervical spine (Tr. 346). The following month, Dr. Brooks re-prescribed Valium and MS Contin but opined that "other types of pain management" were more appropriate than opiates (Tr. 344). In December, 2010, Dr. Brooks noted a diagnosis of fibromyalgia but noted that Plaintiff was "doing reasonably well" and taking Cymbalta (Tr. 342).

May, 2011 treating records state that Plaintiff had stopped seeing a psychiatrist (Tr. 337). In July, 2011, Plaintiff was admitted for inpatient treatment after being diagnosed with deep vein thrombosis ("DVT") (Tr. 314,316, 318-319, 324-325, 328). Hospital records note that Plaintiff smoked and was currently on hormone therapy (Tr. 326, 328). Upon discharge, she was prescribed blood thinners (Tr. 320). The same month, Dr. Brooks noted Plaintiff's report that she had stopped smoking and ceased the use of birth control pills (Tr. 280). The following month, Dr. Brooks noted that Plaintiff's attempts to stop smoking had failed (Tr. 278).

In October, 2011, Dr. Brooks noted that Plaintiff had "been doing well" aside from the side effect of hematuria from blood thinners and was traveling to South Carolina for two weeks (Tr. 335). The following month, Dr. Brooks noted that she was "doing fairly well" with a "more upbeat" mental status (Tr. 334).

A November, 2012 psychological intake assessment noted a GAF of 40 due to depression, opioid dependence, amphetamine abuse, and the effects of the motor vehicle accident (Tr. 448). Intake records note Plaintiff's report of depression, anxiety, crying, fatigue, hopelessness, sleep disturbances, and a 100-pound weight gain (Tr. 448). March, 2013 records psychological treating records note Plaintiff's report that she had "no one to turn to[]" and that a former boyfriend had been convicted in a "murder for hire" scheme (Tr. 449). She reported that she was "doing a lot better" in recent months (Tr. 449). Plaintiff reported that she had been "getting up" "getting dressed," "doing her hair and make-up and

leaving the house almost daily" (Tr. 463). Treating records noted the absence of psychotic symptoms but found the presence of a "borderline personality disorder and polysubstance abuse" (Tr. 451). June, 2013 psychological records note that Plaintiff was tearful with poor hygiene (Tr. 455).

September, 2013 records by neurologist Marvin Bleiberg, M.D. note Plaintiff's report of cervical pain radiating into her shoulders (Tr. 466). Dr. Bleiberg observed that Plaintiff was in no acute distress with a normal affect, mood, speech, and gait (Tr. 467, 472-473). He prescribed a limited dose of MS Contin (Tr. 467). He noted that a urine analysis showed the presence of Methadone (Tr. 468). The same month, Plaintiff underwent laser treatment for the neck condition (Tr. 470).

## 2. Non-Treating Records

In July, 2012, R. Scott Lazzara, M.D. performed a consultative physical examination on behalf of the SSA, observing Plaintiff's report of chronic pain since the motor vehicle accident (Tr. 356). Plaintiff reported that she lived with her family but was able to drive and perform activities of daily living (Tr. 356). She reported depression as a result of weight gain and physical symptoms (Tr. 356). She denied problems sitting or standing and admitted that she could walk one mile provided that she took breaks (Tr. 356). Dr. Lazzara noted normal concentrational abilities with appropriate insight and judgment (Tr. 357). He observed full grip strength and no difficulty getting on and off the examination table, heel and toe walking, or squatting (Tr. 357). Plaintiff displayed a reduced range of cervical spine

motion but no other range of motion limitations (Tr. 358). Dr. Lazzara noted the absence of radicular symptoms but noted that Plaintiff might "be having intermittent cord impingement" (Tr. 360). Plaintiff reported that she could lift 20 pounds (Tr. 360).

Later the same month, Shahida Mohiuddin, M.D. performed a non-examining review of the treating records on behalf of the SSA, finding that Plaintiff could lift 20 pounds occasionally and 10 frequently; sit, stand, or walk for around six hours in an eight-hour workday; and push and pull without limitation (Tr. 90, 92). He found that Plaintiff was capable of occasional climbing and balancing and frequent stooping, kneeling, crouching, and crawling (Tr. 91). He found a limitation to frequent overhead reaching (Tr. 91).

On August 1, 2012, Kathryn Pekrul, Ph.D. performed a psychological evaluation on behalf of the SSA, noting Plaintiff's report of depression due to the traumas of the car accident, her former boyfriend stealing $18,000 from her, and a sexual assault at age 16 (Tr. 363-364). Plaintiff reported "no motivation" and that she spent her days in bed (Tr. 363). She reported a suicide attempt 18 months earlier (Tr. 363). She reported that she was able to work 15 hours a week in her father's pharmacy in the two years following the accident (Tr. 363). She reported that she had attempted two jobs in the past year but was forced to quit due to chronic pain (Tr. 363). Plaintiff noted that she required assistance with money management due to her tendency to spend "too much" (Tr. 364).

Dr. Pekrul noted no symptoms of psychosis (Tr. 364). Plaintiff appeared "severely depressed" but was "polite and well spoken" with above average social skills and good grooming (Tr. 364). She exhibited a normal memory (Tr. 365). Dr. Pekrul assigned a GAF of 42 due to major depression, anxiety, fibromyalgia, incontinence, chronic pain, and financial problems (Tr. 366). She gave Plaintiff a guarded prognosis but found that she would be capable of managing her benefit funds (Tr. 366).

### 3. Records Submitted After the ALJ's November 13, 2013 Decision

October 8, 2013 notes by Dr. Marvin Bleiberg state that Plaintiff was a "no show" (Tr. 550). October 15, 2013 treating notes by Dr. Bleiberg state that Plaintiff was well-groomed and in no acute distress with full orientation and a normal mood (Tr. 548). Plaintiff requested more Adderall because hers was "stolen" (Tr. 547). An October 29, 2013 MRI of the cervical spine show no stenosis but "possible nerve root compromise" at C4-C5 (Tr. 552). On November 4, 2013, Dr. Bleiberg noted Plaintiff's report of extreme but non-radiating neck and head pain (Tr. 544). On November 28, 2013, Dr. Bleiberg noted that Plaintiff appeared in no acute distress and was fully oriented despite reports of 8-9/10 pain (Tr. 541-542).

## C. Vocational Expert Testimony

VE Michelle A. Ross classified Plaintiff's former work as a hostess as semiskilled at the light level of exertion[4] (Tr. 261).

The ALJ described a hypothetical individual of Plaintiff's age, education, and work experience:

> This individual can occasionally climb stairs and ladders and balance; can frequently stoop, kneel, crouch, and crawl; can frequently lift the upper extremities above head. This individual can perform simple tasks on a sustained basis; will best work alone or in a small, familiar group with only superficial contact with the public. Can this hypothetical individual do any of the past work of this claimant? (Tr. 78).

In response, the VE testified that the above limitations would preclude Plaintiff's past relevant work but would allow for the unskilled, light work of a machine tender (7,800 jobs in the state economy); light assembler (14,000); and line attendant (4,800) (Tr. 78). She testified that if the limitations were amended to limit the hypothetical individual to work with a sit/stand option; a preclusion on ladders; occasionally balancing, pushing, and pulling with the upper extremities; frequent kneeling; occasional climbing stairs, stooping, crouching, and

---

[4]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. *Very Heavy* work requires "lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more. § 404.1567(e).

over head reaching; limited to tasks "directly in front of the individual;" and a preclusion on crawling, assembly line work, and work limited to "alone or in the small, familiar groups," the line attendant job would be eliminated but the other jobs would be available in the same numbers (Tr. 79). The VE stated that the amended hypothetical limitations would also allow for the light, unskilled work of a packager (6,300) and sedentary, unskilled work of a machine attendant (4,000); parts checker (3,000); and inserter (3,600) (Tr. 80). The VE stated that if the same individual were required to reclined thoughout the day for "physical and mental management," or, were off-task for more than 15 percent of the workday, no jobs would be available (Tr. 80-81). The VE stated that her testimony was consistent with the information found in the *Dictionary of Occupational Titles* (*"DOT"*) except for the testimony regarding the sit/stand option which was based on his own profession experience (Tr. 79). In response to Plaintiff's attorney, the VE stated that if the amended hypothetical restrictions included a preclusion on all stopping, crawling, overhead work, or pushing and pulling, the job numbers would remain unchanged (Tr. 81).

### D. The ALJ's Decision

Citing the medical records, the ALJ found that Plaintiff experienced the severe impairments of "degenerative disc disease, status-post cervical decompression and fusion, fibromyalgia, obesity, an affective disorder, and anxiety disorder, and borderline personality disorder" but that none of the conditions met or equaled any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 16-18). She found that the conditions of DVT,

Attention Deficit Disorder ("ADD") and Attention Deficit Hyperactivity Disorder ("ADHD") were non-severe (Tr. 17-18). The ALJ found that Plaintiff experienced moderate limitation in activities of daily living, social functioning, and concentration, persistence, or pace (Tr. 19-20). She noted that Plaintiff had not experienced episodes of decompensation of "extended duration" as defined by 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 21).

The ALJ found that Plaintiff retained the residual functional capacity ("RFC") for light work with the following additional limitations:

> [S]he requires a sit/stand option. She can occasionally push and pull with the upper extremities. She can occasionally climb stairs, but never ladders. She can occasionally balance. She is able to kneel frequently. She is able to crouch and stoop occasionally, but cannot crawl. She can occasionally lift her upper extremities overhead. She will need a task that is directly in front of her. She is unable to perform tasks on an assembly line. She will work best alone or in small, familiar groups with only superficial contact with the public (Tr. 22).

Citing the VE's testimony, the ALJ found that while Plaintiff was unable to perform her past relevant work, she could work as a machine tender, assembler, or packager (Tr. 39, 78-80).

The ALJ discounted Plaintiff's professed degree of physical and emotional limitation (Tr. 24-37). The ALJ cited the treating neurosurgeon's January, 2007 report that Plaintiff was "doing very well" (Tr. 24). She noted that in August, 2007, Plaintiff reported good results from good pain control from facet rhizotomies and that July, 2008 records showed only "mild[] to moderate reduced cervical rotation" (Tr. 25).

-15-

The ALJ observed that treating notes created the month of the alleged onset of disability showed a normal range of neck motion and in October, 2011, a neurological examination of the upper and lower extremities was unremarkable (Tr. 28). She cited Plaintiff's November, 2011 report that the neck pain was well controlled (Tr. 28). The ALJ noted that the psychological treating records for the relevant period showed normal memory, concentration, insight, and judgment (Tr. 31).

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less that a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of

whether it has been cited by the ALJ.  *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy.  20 C.F.R. §416.920(a).  The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five  to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## ANALYSIS

Plaintiff, now proceeding *pro se,* contends that she has experienced disability-level physical problems since the 2005 car accident.  *Plaintiff's Brief,* 1, *Docket #17,* Pg ID 629. She reports ongoing headaches, dizziness, blurred vision, radiating neck pain, and light and

noise sensitivity. *Id.* She states that her need to lie down for most of the day resulted in surgery for DVT. *Id.* Plaintiff reports that her physical problems have taken an emotional "toll" and that she does not leave the house often. *Id.* She states that she has multiple work attempts have failed due to her physical symptoms. *Id.* at 1-2.

## A.  Substantial Evidence Supports the ALJ's Determination[5]

The ALJ acknowledged that Plaintiff's alleged physical and psychological problems caused some degree of limitation. She cited July, 2008 treating records showing mildly to moderately reduced cervical spine motion (Tr. 25). She noted that in September, 2010, Plaintiff reported an exacerbation of neck pain while cleaning and exhibited left-sided neck and shoulder spasms (Tr. 26). She cited July, 2011 records showing a diagnosis of fibromyalgia and September, 2011 records showing a "severely restricted motion" of the neck (Tr. 28). She noted Plaintiff's September, 2013 allegation of neck pain radiating into her shoulder and difficulty bending, driving, and turning her head (Tr. 28). She acknowledged that Plaintiff experienced some degree of limitation by limiting her to exertionally light work with a sit/stand option and occasional climbing stairs, balancing, crouching/stooping, and reaching overhead (Tr. 22). She precluded all use of ladders and crawling and found that Plaintiff would require "a task that is directly in front of her" (Tr.

---

[5]

The treating records, as discussed in Section II.B, *above*, and in the administrative opinion suggest that Plaintiff exaggerated her physical symptoms in order to procure narcotic medication. However, because the remainder of the record easily supports the RFC composed by the ALJ, the evidence of drug seeking behavior is omitted from the present discussion.

22).

However, the ALJ provided an exhaustive rationale for declining to find a greater degree of physical limitation. She noted that none of the post-surgical imaging studies supported a finding of greater limitations than those found in the RFC (Tr. 24-29). The ALJ noted that Plaintiff obtained good results with rhizotomy treatment and in November, 2008, reporting that her pain was "fairly well controlled (Tr. 25-26). She cited the September, 2010 emergency room observations that Plaintiff exaggerated her level of neck pain in and was seen "jumping off . . . her bed and walking around her room without difficulty" (Tr. 26). The ALJ cited Dr. Brooks' notes from the next month showing only mild tenderness and a normal range of shoulder motion (Tr. 27). She noted that as of July, 2011, Plaintiff exhibited full muscle strength and a normal range of motion and reflexes (Tr. 28). She observed that the July, 2011 diagnosis DVT was likely attributable to smoking and the use of birth control pills (Tr. 28, 326, 328). The ALJ cited Plaintiff's July, 2012 report to Dr. Lazzara that she could lift 20 pounds and walk up to a mile with breaks (Tr. 28). The ALJ noted that Dr. Lazzara's observations included the ability to squat, a normal gait, and intact grip strength (Tr. 28). The ALJ noted that Plaintiff did not seek treatment for her medical conditions between November, 2011 and September, 2013 (Tr. 28).

My own review of the evidence supports the ALJ's findings regarding the physical limitations. At worst, Dr. Lazzara found that Plaintiff might experience "intermittent cord impingement" causing "mild to moderate" limitations (Tr. 360). However, Plaintiff admitted

that she was capable of lifting 20 pounds, which is consistent with the RFC for exertionally light work (Tr. 22, 356). As to the treating records for the relevant period, Dr. Brooks noted in October, 2011, that Plaintiff had "been doing well" and was making plans to travel to South Carolina for two weeks (Tr. 335). His November, 2011 records state that she was "doing fairly well" with a "more upbeat" mental status (Tr. 334). While Dr. Bleiberg noted Plaintiff's report of cervical pain radiating into her shoulders in September, 2013, he observed that she was in no acute distress with a normal affect, mood, speech, and gait (Tr. 466-467, 472-473). He limited Plaintiff's treatment to exclusively conservative measures (Tr. 470).

As to the psychological limitations, the ALJ's finding that Plaintiff was restricted to unskilled, non-assembly line jobs limited to working "alone or in small, familiar groups with only superficial contact with the public" is also well supported and explained (Tr. 22, 78-80). The ALJ cited treating and consultative records showing that Plaintiff was generally well groomed and had been doing her hair and makeup and leaving the house on an almost daily basis (Tr. 20). The ALJ cited Dr. Pekrul's finding that Plaintiff had above-average social skills (Tr. 20). She noted that while Plaintiff was initially unable to participate in group therapy during the four-day August, 2010 inpatient stint, she attended and was attentive in subsequent sessions (Tr. 20). The ALJ noted that during the relevant period, Plaintiff did not require reminder to take medication of care for her personal needs and was able to "count change, drive, and shop" (Tr. 21). She cited Dr. Lazzara's observation that of intact

immediate, recent, and remote memory with normal concentration (Tr. 21).

The ALJ's findings of psychological limitation are also consistent with my own review. The pre-onset records include a four-day inpatient psychiatric stint. However, Plaintiff's need for short-term inpatient care appeared to be precipitated (understandably) by the situational stressors of an impending eviction, her boyfriend's conviction for a murder-for-hire scheme, and betrayals by both her boyfriend and mother. Plaintiff's October, 2013 testimony that she currently lived by herself at the family's summer home and that her mother provided emotional and practical support points to the conclusion that the extreme conditions leading to the need for inpatient treatment had resolved (Tr. 52). Treating records from July, 2011 forward show that Plaintiff was able to travel (Tr. 335). Psychological treating records state that Plaintiff was "doing a lot better" as of March, 2013 (Tr. 449) While the psychological treating records show some degree of ongoing psychological symptomology, Plaintiff was able to get dressed, fix her hair and make, and leave the house on an almost daily basis (Tr. 451). Dr. Bleiberg's September, 2013 records note an unremarkable effect (Tr. 467, 472-473).

### B. Evidence Submitted After the Administrative Opinion

The material submitted by Plaintiff's former attorney subsequent to the ALJ's November 13, 2013 decision likewise does not provide grounds for remand (Tr. 2, 540-553). The sixth sentence of 42 U.S.C. § 405(g), pertains to records submitted after the

administrative determination, stating that the court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding ...." As such, the newer evidence may be considered only for purpose of determining whether remand is appropriate under the sixth sentence of § 405(g).

Even assuming that Plaintiff could provide "good cause" for the failure to submit the newer evidence prior to the administrative decision, she cannot show that it is "material" to the ALJ's decision. To show that the newer evidence is material, the claimant "must demonstrate that there was a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence." *Sizemore v. Secretary of Health & Human Services*, 865 F.2d 709, 711 (6th Cir.1988). The newer records do not suggest greater physical or mental limitations than those found in the RFC. In October, 2013 Dr. Bleiberg observed that Plaintiff was well-groomed and in no acute distress with full orientation and a normal mood (Tr. 548). The October 29, 2013 MRI of the cervical spine showing no stenosis but "possible nerve root compromise" at C4-C5 (Tr. 552) is consistent with Dr. Lazzara's finding of possible "intermittent cord impingement" from the year before (Tr. 350). Dr. Bleiberg's November, 2013 records note Plaintiff's report that the neck and head pain were non-radiating (Tr. 544). His records state that despite Plaintiff's allegations of extreme pain, she did not appear in acute distress and exhibited

normal concentrational abilities (Tr. 541-542).

My recommendation to uphold the ALJ's determination should not be read to trivialize Plaintiff's considerable personal challenges or the physical and psychological limitations supported by the record. However, after considering Plaintiff's motion and reviewing the transcript for other possible grounds for remand, I conclude that the the ALJ's decision is well within the "zone of choice" accorded the administrative fact-finder and thus, should not be disturbed by this Court. *Mullen supra,* 800 F.2d at 545.

## CONCLUSION

For the above-stated reasons, I recommend that Defendant's Motion for Summary Judgment [Docket #21] be GRANTED, and that Plaintiff's Motion for Summary Judgment [Docket #17] be DENIED.

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D.

-23-

Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than 20 pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: August 4, 2017                        s/R. Steven Whalen
                                             R. STEVEN WHALEN
                                             U.S. MAGISTRATE JUDGE

---

**CERTIFICATE OF SERVICE**

I hereby certify on August 4, 2017 that I electronically filed the foregoing paper with the Clerk of the Court sending notification of such filing to all counsel registered electronically. I hereby certify that a copy of this paper was mailed to non-registered ECF participants August 4, 2017.

                                             s/Carolyn M. Ciesla
                                             Case Manager for the
                                             Honorable R. Steven Whalen